IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| NICHOLAS PAUL SHERWOOD, | ) | Case No. 3:20-cv-1037 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Nicholas Paul Sherwood, pro se, seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).  Sherwood suffers from intractable pain due to a congenitally narrow thecal sac and alleges that the pain is worsened because of bulging discs in his back.  He also alleges severe mental health issues.  He challenges the ALJ's negative findings, contending that his allegations of pain and the medical evidence were misevaluated. However, because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Sherwood's application for DIB be affirmed.

I.      **Procedural History**

On November 14, 2016, Sherwood applied for DIB.  (Tr. 147-48).[1]  Sherwood alleged

that he became disabled on December 1, 2015, due to "1. Lower Back Injury; 2. Pain in right

hamstring; [and] 3. Pain in right shin."  (Tr. 147, 162).  The Social Security Administration

denied Sherwood's application initially and upon reconsideration.  (Tr. 64-77, 79-91).  Sherwood

requested an administrative hearing.  (Tr. 101).  ALJ Dianne S. Mantel heard Sherwood's case

on October 16, 2018 and denied the claim in a March 14, 2019 decision.  (Tr. 11-25, 31-63).  On

March 10, 2020, the Appeals Council denied further review, rendering the ALJ's decision the

final decision of the Commissioner.  (Tr. 1-3).  On May 12, 2020, Sherwood filed a complaint to

obtain judicial review.  ECF Doc. 1.

II.     **Evidence**

A.      **Personal, Educational, and Vocational Evidence**

Sherwood was born on September 10, 1992 and was 23 years old on the alleged onset

date.  (Tr. 64, 147).  He was 24 years old on June 30, 2017 – the date last insured.  (Tr. 13, 147).

Sherwood completed high school and, as of December 2015, had completed four or more years

of college.  (Tr. 163).  He had no specialized training or past relevant work.  (Tr. 23, 163).

B.      **Relevant Medical Evidence**

On March 1, 2016, Sherwood visited David DelliQuadri, DO, with concerns about his

mental health, indicating that he was depressed, had suicidal thoughts, and got anxious when he

thought about his condition.  (Tr. 251).  Sherwood reported that he first noticed depressive

symptoms three years earlier, when he began failing in college.  (*Id.*).  His symptoms included

---

[1] The administrative transcript appears in ECF Doc. 13.

depressed mood, anxiety, loss of interest, guilt, trouble concentrating, trouble falling asleep, and excessive sleep.  (*Id.*).  And he had gained 60-80 lbs. over the previous 5 years.  (*Id.*).

Upon examination, Sherwood reported daily suicidal thoughts; but he was not tired and had not lost interest in things; he played video games; he felt guilty about things; and his friends from school were positives in his life.  (*Id.*).  He was 74 inches (6.16 ft.) tall and weighed 319.4 lbs.  (Tr. 252).  Dr. DelliQuadri noted that Sherwood appeared alert and oriented, in no acute distress, pleasant, had flat affect, and was well appearing.  (Tr. 252).  Dr. DelliQuadri also noted: (1) gross sensation intact and 5/5 strength in the upper and lower extremities; (2) 2/5 bilateral patella deep tissue reflexes; (3) no gross neurological defects; and (4) no clubbing, cyanosis, or edema.  (*Id.*).  Dr. DelliQuadri diagnosed Sherwood with: (i) depression, unspecified depression type, for which he prescribed sertraline and counseling; (ii) obesity, for which he encouraged more activity; and (iii) rash.  (Tr. 252-53).

On March 29, 2016, Sherwood returned for a follow-up visit.  (Tr. 248).  Sherwood reported that his depression was getting "a little bit better," he had less frequent suicidal thoughts, and he wanted to think more on getting counseling.  (*Id.*).  Sherwood also reported lower back and leg pain, indicating that he had pain in the middle of his spine with no radiation after sitting for 45 minutes and pain on the right anterior thigh with hip flexion.  (*Id.*).  Sherwood stated that there were times when his back would lock up and could not be relieved by lying down.  (*Id.*).  His back pain had been going on for six years.  (Tr. 249).

Upon examination, Sherwood weighed 315.8 lbs. and was alert and oriented, in no acute distress, pleasant, and well-appearing.  (*Id.*).  Dr. DelliQuadri noted that Sherwood had a negative straight leg raise, intact gross sensation and 5/5 strength in his extremities, no gross neurological defects,  2/5 patella deep tendon reflexes, and midline tenderness to direct palpation at the lumbar region with associated paraspinal pain to palpation.  (*Id.*).  Dr. DelliQuadri

repeated Sherwood's depression diagnosis, adding chronic midline low back pain without

sciatica.  (*Id.*).  Dr. DelliQuadri doubled the dosage of sertraline, stating that: he did not believe

that Sherwood needed to see a psychiatrist; Sherwood lived with his parents and had goals, such

as going back to school; and Sherwood was looking for a job.  (*Id.*).  For Sherwood's back pain,

Dr. DelliQuadri referred Sherwood to a physical therapist, ordered X-rays, and suggested

NSAIDs.  (*Id.*).

On March 30, 2016, Sherwood had X-rays taken of his back, which showed mild disc

narrowing at L5-S1 and facet joint arthrosis.  (Tr. 266).

On April 26, 2016, Sherwood returned to Dr. DelliQuadri for a depression check.  (Tr.

245).  Sherwood reported that he felt better; was happy with the way the antidepressant made

him feel; suffered no side effects; only occasionally thought about suicide; and would like to

continue medication.  (*Id.*).  He also reported that his back pain had improved with physical

therapy.  (*Id.*).  Upon examination, he weighed 317.8 lbs. and had no clubbing, cyanosis, or

edema.  (Tr. 245-46).  Sherwood was alert and oriented, in no acute distress, pleasant, and well

appearing.  (*Id.*).  Dr. DelliQuadri stated that he was "very happy" with Sherwood's depression

treatment and agreed to maintain his medication at current dosage levels.  (Tr. 246).

Dr. DelliQuadri also stated that he reviewed Sherwood's X-rays, noting "Stable back.  I believe

that if he continues to do PT he will gain a lot of benefits … in the long run. … Continue

conservative NSAID therapy."  (*Id.*).

On June 9, 2016, Sherwood presented to Dr. DelliQuadri with increased back and leg

pain.  (Tr. 242).  Sherwood indicated that after his last day of physical therapy, he sat in a car for

a long time and had increasing pain in his back and legs.  (*Id.*).  Specifically, he had pain on the

lateral side of his calf muscle on the right leg and right hamstring.  (*Id.*).  Moving his left leg hurt

the right leg.  (*Id.*).  Sherwood expressed that he wanted to get a job, but his low back pain

bothered him.  (*Id.*).  At the time, Sherwood was taking Hydroxyzine and ibuprofen and weighed 318.2 lbs.  (Tr. 242-43).  Upon examination, Sherwood appeared alert and oriented, in no acute distress, and pleasant.  (Tr. 243).  He was unable to raise his right leg more than a few degrees over 90° and had "really tight hamstrings," negative left raise that promoted pain on the opposite side, left paraspinal tenderness at L3 on the left side, and offset gait.  (*Id.*).  Dr. DelliQuadri repeated Sherwood's back pain diagnosis and prescribed Prednisone and Cyclobenzaprine.  (*Id.*).

On June 27, 2016, Sherwood presented with joint and extremity pain, indicating that he had worsening pain in his right leg.  (Tr. 254-55).  Sherwood also reported lateral ankle and fibular pain.  (Tr. 255).  He had been frequently lying on his back because of the amount of pain he was in, which he described as "achy," constant, and "almost like it's a cramp."  (*Id.*).  Sherwood's mother told Dr. DelliQuadri that Sherwood had a limp for about a year.  (*Id.*).  Sherwood also stated that he had worsening depression.  (*Id.*).  Upon examination, Sherwood appeared overweight and obese, "healthy-appearing," and in no apparent distress.  (*Id.*).  Dr. DelliQuadri noted normal ambulation; decreased range of motion with straight leg raise and very tight hamstrings; no cyanosis or edema; no tenderness to palpation any areas of the leg; stable joint; no ankle swelling; gross sensation intact; normal gait; and some paraspinal tenderness at the lower lumbar region.  (Tr. 255-56).

Dr. DelliQuadri diagnosed Sherwood with pain in the right leg, noting it was a "complicated complaint" and that he had "[v]ery vague symptoms."  (Tr. 256).  Dr. DelliQuadri referred Sherwood for neurological evaluation and prescribed prednisone, cyclobenzaprine, and ketorolac injections.  (*Id.*).  Dr. DelliQuadri stated that he related "a lot of this" – in reference to Sherwood's musculoskeletal complaints – "to sedentary lifestyle and possible psychosomatic as well."  (*Id.*).

On July 7, 2016, Sherwood underwent an EMG of the right lower extremity.  (Tr. 272).
The results of the EMG were "normal."  (*Id.*).

On July 25, 2016, Sherwood returned to Dr. DelliQuadri for a follow up on his right leg
pain.  (Tr. 257-58).  Sherwood's mother told Dr. DelliQuadri that she was concerned because all
Sherwood did was lie around the house and had been unable to work for six months.  (Tr. 258).
Sherwood reported that steroids helped with the pain, but he continued to have pain and a
tingling sensation in the right lateral aspect of the right leg.  (*Id.*).  He also had a panic attack a
few days before the appointment because he had forgotten to take his pills.  (*Id.*).  Sherwood
denied depression, reporting instead anxiety.  (*Id.*).  Upon examination, Sherwood: (1) appeared
overweight and obese; (2) did not appear in acute distress; (3) exhibited a slight change in gait
from the right leg; (4) had no cyanosis or edema in the extremities; (5) had grossly intact
sensation and 2/4 patella deep tendon reflexes; and (6) had generalized tenderness at the
paraspinal region of the lumbar spine.  (Tr. 258-59).

Dr. DelliQuadri diagnosed Sherwood with pain in the right leg and depressive disorder.
(Tr. 259).  Dr. DelliQuadri noted that Sherwood's mother had been insistent that something was
wrong with Sherwood and could not work and suggested that sciatica might be the cause.  (*Id.*).
Dr. DelliQuadri determined than an MRI would be appropriate to rule out lumbar spine
pathology and prescribed naproxen.  (*Id.*).  Regarding Sherwood's anxiety, Dr. DelliQuadri
stated that Sherwood "has been good with his depression, he just wants to have his pain under
control.  Does not want to hurt himself or others."  (*Id.*).

On August 31, 2016, Sherwood received an MRI scan of his lower back.  (Tr. 264).  The
results showed: moderate central disc protrusion at L4-L5; congenital narrowing of the thecal sac
at L4-L5, with mild additional narrowing noted secondary to disc protrusion; and mild central
annular bulging at L3-L4 and L5-S1.  (Tr. 265).

On September 9, 2016, Sherwood visited Dr. DelliQuadri to discuss the MRI results.  (Tr. 238).  Sherwood reported that his overall pain was getting better, but he was not working because of pain.  (*Id.*).  He had not been to physical therapy and had tried to slow down doing home stretches.  (*Id.*).  Sherwood suffered pain in the right thigh after sitting for a long time and pain in his left sacroiliac region when he stood up.  (*Id.*).  He had no more pain in his right lower extremity.  (*Id.*).  Sherwood also reported that his depression had been getting better because he was starting to be able to do more "things."  (*Id.*).

Upon examination, Sherwood appeared alert and oriented, in no acute distress, and obese (331.3 lbs.), and had no clubbing, cyanosis, or edema.  (Tr. 239).  Sherwood's straight leg raise was limited due to tightness and produced counter lateral pain at the left lower back.  (*Id.*).  He had no point tenderness over the right thigh, exhibited generalized lumbar pain bilaterally in the paraspinal and sacroiliac regions, had 4/5 patella deep tendon reflexes, had grossly intact sensation, and was able to "stand on tip toes and heels independently."  (*Id.*).

Dr. DelliQuadri assessed Sherwood with low back pain, mild episode of recurrent major depressive disorder, other chronic pain, and a BMI of 45 to 49.9.  (*Id.*).  Dr. DelliQuadri stated that he did not have a diagnosis for Sherwood's right thigh sensory type pain. (*Id.*).  Naproxen and cyclobenzaprine helped Sherwood's symptoms and the MRI results did not reveal apparent nerve root or canal protrusion.  (*Id.*).  Dr. DelliQuadri referred Sherwood to physical therapy and neurology, continued naproxen and cyclobenzaprine, and prescribed omeprazole.  (*Id.*).  He noted minor gait disturbance, which Sherwood indicated began when he was in college.  (*Id.*).  Dr. Sherwood also continued sertraline, at half the previous dose.  (*Id.*).

On November 17, 2016, Sherwood presented to Steven Benedict, MD, for a neurological consultation for leg paresthesia.  (Tr. 267).  Sherwood reported pain (4/10) in his right thigh and calf and lower back.  (Tr. 267-68).  Lifting his left leg caused pain in his right leg, and the

paresthesia occurred mostly when sitting.  (Tr. 268).  Sherwood stated that he was pain free

when laying down.  (*Id.*).  He had trouble shifting between sitting and standing and had less pain

when walking than when just standing.  (*Id.*).  He reported a limp when walking and numbness

and tingling when he did physical therapy.  (*Id.*).  His pain, however, had improved over the

previous couple of months.  (*Id.*).

Upon examination. Dr. Benedict noted that Sherwood: (1) was well developed, well

nourished, and in no acute distress; (2) had normal orientation, fund of knowledge, and memory;

(3) was awake and alert; (4) had normal gait and sensation; and (5) had negative bilateral straight

leg raise tests.  (Tr. 269-70).  Dr. Benedict diagnosed Sherwood with degenerative disc disease

and lumbar back pain.  (Tr. 270).  He noted that Sherwood had recurrent leg pain that likely was

secondary to lumbar root irritation and radiculopathy due to lumbar disc herniation.  (*Id.*).

Dr. Benedict prescribed Neurontin for neuropathic pain.  (Tr. 270-71).

On December 19, 2016, Sherwood returned to Dr. Benedict, reporting 10/10 pain.  (Tr.

331).  Sherwood noticed no difference in pain with Neurontin and stated that, since his last visit,

his whole right foot had gone numb at the toes a couple of times.  (Tr. 332).  Sherwood's

examination results were the same as his previous visit.  (Tr. 332-34).  Dr. Benedict doubled the

amount of Neurontin per day (one capsule per day to two).  (Tr. 334).

On January 24, 2017, Sherwood visited Dr. DelliQuadri for a follow up.  (Tr. 313).  He

reported that his upper thigh pain had "much improved" and was happy with his treatment.  (*Id.*).

He had been feeling "down at night" but his depression was not as bad as before.  (*Id.*).  He was

willing to start psychological counseling and increase his sertraline dosage.  (*Id.*).  Sherwood

also reported playing "a lot" of video games and not getting much exercise.  (*Id.*).  Upon

examination, Sherwood weighed 354.8 lbs.; appeared alert and oriented, pleasant, and in no

acute distress; and had no bilateral clubbing, cyanosis, or edema in his extremities.  (Tr. 314-15).

He was diagnosed with depression, unspecified type.  (Tr. 314).  Dr. DelliQuadri noted some improvement with Sherwood's depression, increased his sertraline dosage, and referred him to counseling.  (Tr. 315).

On February 13, 2017, Sherwood visited Firelands Counseling for an assessment and was seen by Michele Porter, LSW.  (Tr. 283).  Sherwood reported that his symptoms began four years earlier.  (*Id.*).  He was unable to keep up with schoolwork and experienced associated feelings of anxiety.  (*Id.*).  Eventually, his symptoms worsened to the point that he did not attend classes, lied to his parents about his attendance, contemplated suicide, isolated for days at a time without seeing anyone, did not attend to personal care for extended periods of time, and ate more.  (*Id.*).  At the time of the evaluation, he had low energy, loss of interest in things he used to enjoy – such as video games – and little motivation to get out of bed.  (*Id.*).  Sherwood also reported, however, that his isolation was not as bad as a year and a half before and he looked forward to playing games with friends and socializing online.  (*Id.*).  He stated that his challenge to employment was chronic pain.  (Tr. 285).

Porter stated that Sherwood's barrier to treatment progress included lack of motivation due to depression, but Sherwood did not see it as a current issue.  (Tr. 287).  His clinical distress score was below the clinical cut off, indicating a significant need for treatment.  (*Id.*).  During the evaluation, he appeared cooperative and highly motivated for treatment.  (*Id.*).  Porter diagnosed Sherwood with major depressive disorder, mild, recurrent due and referred him to individual counseling and a psychiatric intake.  (Tr. 287-88).

On February 16, 2017, Sherwood visited Dr. Benedict for a follow up on his leg paresthesia, stating that he was doing better but still had some pain.  (Tr. 327).  His examination results were identical to those of his November 17 and December 19, 2016 visits.  (Tr. 328-29).  Dr. Benedict assessed Sherwood with lumbar pain and paresthesia with myalgia.  (Tr. 329).

Dr. Benedict increased Sherwood's Neurontin to 400 mg. after having increased it on February 1, 2017 to 300 mg. and continued his naproxen and Flexeril. (Tr. 329, 457).

On February 28, 2017, Sherwood visited Dr. DelliQuadri for a follow up on his weight and depression. (Tr. 309). Sherwood stated that his antidepressant was not helping and still had depressed thoughts, but it "does help a little bit." (*Id.*). He indicated that he was sleeping a bit better, was trying to get back into school, still played video games, had followed up with the weight loss clinic and was counting calories, and was slowly starting to add exercise to his routine. (*Id.*). Upon examination, Sherwood weighed 360 lbs.; appeared alert, oriented, pleasant, and in no acute distress; had normal gait and grossly intact sensation; and had no clubbing, cyanosis, or edema in his extremities. (Tr. 310-11). Dr. DelliQuadri increased Sherwood's sertraline to the maximum dose and encouraged him to exercise more and lose weight. (Tr. 311).

On April 17, 2017, Sherwood returned to Dr. DelliQuadri, stating that he was "[f]eeling alright." (Tr. 305). While not depressed, he had ups and downs and was overall better than when he started medication. (*Id.*). He wanted to go back to school but had issues with his back pain and was not able to sit/stand for long periods of time. (*Id.*). Neurological treatment was helping, but he was not at 100%. (*Id.*). He wanted to exercise, but everything hurt and was difficult. (*Id.*). He also had lost 20 lbs. (weighing 340 lbs.) since his last appointment after stopping his soda intake. (Tr. 305-06).

Upon examination, Sherwood was alert, oriented, in no acute distress, and pleasant. (Tr. 306). Dr. DelliQuadri diagnosed Sherwood with depression, unspecified type, weight loss, and chronic midline low back pain without sciatica. (Tr. 307). Dr. DelliQuadri offered to switch Sherwood's antidepressant medication, but Sherwood refused, stating that he did not want to be depressed again if the drug did not work. (*Id.*). Dr. DelliQuadri observed that Sherwood was

"much better than he was" and encouraged him to socialize with friends and get more exercise. (*Id.*).  Dr. DelliQuadri further noted that Sherwood's back pain had improved since starting neurological treatment.  (*Id.*).

On May 9, 2017, Sherwood presented to Dr. Benedict for a follow up on his leg paresthesia, indicating that the Neurontin "made no difference" yet "the pain is lightly decreased."  (Tr. 322).  Upon examination, Sherwood weighed 337 lbs.; appeared alert, oriented, and in no acute distress; exhibited normal memory, attention, concentration, and fund of knowledge; had normal gait and sensation; and had negative straight leg raises.  (Tr. 322-25). Dr. Benedict stated that Sherwood was unable to tolerate higher doses of Neurontin due to increased thoughts of suicide, so he started to decrease the dose and discontinue the medication after four days, prescribed Cymbalta, continued naproxen and Flexeril, and arranged for epidural steroid injections of the lumbar spine to address Sherwood's lumbar pain due to a lack of response to conservative treatment.  (Tr. 325).

On June 9, 2017, Sherwood returned to Dr. Benedict and received a lumbar epidural nerve block injection.  (Tr. 469-70).  At the time, his weight was 329 lbs. and he reported his pain as 3 out of 10.  (Tr. 469).

On July 24, 2017, Sherwood presented to Jenna Lizzi, PA-C, for a follow up on his epidural injection, reporting 5 out of 10 pain.  (Tr. 473).  Upon examination, Sherwood appeared alert, oriented, and in no acute distress.  (Tr. 474).  He had normal memory, fund of knowledge, sensation, and gait, as well as negative straight leg raise.  (Tr. 474-75).  Lizzi noted suicidal thoughts, but Sherwood never heard back from his psychologist.  (Tr. 475).  Sherwood reported no relief from his epidural injection.  (*Id.*).  Lizzi scheduled another injection, prescribed omeprazole, and continued medication.  (Tr. 476).

On August 14, 2017, Sherwood's insurance denied coverage of epidural injections. (Tr. 481).  He returned to Dr. Benedict on August 25, 2017 for trigger point injections.  (Tr. 482).  Sherwood weighed 330 lbs. and reported his pain as 4 out of ten.  (*Id.*).  He was assessed with lumbar radiculopathy due to degenerative lumbar spine disease with intractable back pain, and Dr. Benedict administered trigger point injections.  (Tr. 483).

On September 28, 2017, Sherwood visited Jaqueline Graziani, CNP, indicating that his back pain and right foot paresthesia persisted and that he could not stand for long periods of time.  (Tr. 484).  The injections helped – reducing the pain by more than 50% – with sitting but not standing.  (Tr. 484-85.).  He also reported bilateral knee pain, sharp pain when standing, and numbness in the right foot.  (*Id.*).  Sherwood reported his pain as 7/10 and weighed 334 lbs. (Tr. 484).  He denied depression, anxiety, or suicidal ideations.  (Tr. 485).  Upon examination, Sherwood appeared alert, oriented, and in no acute distress, with normal fund of knowledge sensation, and gait.  (Tr. 485-86).  He had negative straight leg raise.  (Tr. 486).  Graziani increased Sherwood's Cymbalta, continued Flexeril, stopped naproxen, prescribed Mobic, and scheduled another trigger point injection.  (Tr. 486-87).

On October 2, 2017, Sherwood presented to Cameron Conrad, DO, for a follow up on his depression.  (Tr. 386).  Dr. Conrad noted that Sherwood had been tolerating medication with no adverse effect.  (*Id.*).  Sherwood stated that he had an irregular sleep schedule but was able to sleep eight to nine hours.  (*Id.*).  He reported feelings of being uninterested, "the usual" number of episodes of feeling guilty and worthless, episodes of dieting and binge eating, and suicidal ideations twice per week.  (*Id.*).  He also reported anxiety.  (*Id.*).  Upon examination, Sherwood weighed 336 lbs.; appeared alert, oriented, and in no acute distress; had normal affect but depressed mood; did not have ill appearance; and had appropriate grooming, normal insight and judgment, and good memory.  (Tr. 387-88).  Dr. Conrad continued medication.  (*Id.*).

12

On October 23, 2017, Sherwood presented to Lizzi for trigger point injections.  (Tr. 489).

Sherwood returned to Lizzi on November 27, 2017, indicating that the back pain "comes and

goes."  (Tr. 586).  He was able to sit longer, but his pain increased when standing for too long.

(*Id.*).  He also had occasional numbness/tingling in the right foot that happened when he woke

up, throughout the day, and after stretching.  (*Id.*).  Sherwood denied joint or back pain.

(Tr. 587).  Upon examination, he was alert, oriented, and in no acute distress; his spine was

tender upon palpation; his memory was intact; he had normal strength in the upper and lower

extremities; his sensation was intact; his mood and gait were normal; and his affect was

appropriate.  (*Id.*).  Lizzi prescribed trigger point injections, Zanaflex for muscle spasms, and

Flexeril.  (Tr. 588).

On January 30, 2018, Sherwood visited Dr. Benedict for a follow up on his back pain.

(Tr. 589).  Sherwood stated that the trigger point injections were helpful for about one month, the

pain had returned, standing and walking were difficult, and he could not sit in a chair or couch

without "a lot of support."  (*Id.*).  Upon examination, Sherwood appeared alert, oriented, and in

no acute distress; his memory was intact; his sensation was intact; his gait and mood were

normal; and he had appropriate affect.  (Tr. 590).  Dr. Benedict ordered an epidural steroid

injection, continued his medication, and referred Sherwood for a surgical opinion.  (Tr. 590-91).

The injection was administered on February 14, 2018.  (Tr. 592-93).

On February 16, 2018, Sherwood saw Don K. Moore, MD, for a spine surgery consult.

(Tr. 597).  Sherwood reported aching low back and right posterior thigh pain.  (Tr. 598).  The

right thigh pain had "significantly diminished" since onset in February 2016.  (*Id.*).  Sherwood

rated his back pain as 2/10 at sitting and lying, 4/10 when doing so for a long time, 8/10 while

standing, and 10/10 when standing or walking for a long time.  (*Id.*).  Sherwood reported that his

pain radiated from his lower back to the right lateral thigh to the knee.  (*Id.*).  His pain was

13

aggravated by standing, bending over, and getting up from a bent position. (Tr. 598). The pain was alleviated by lying supine and sitting. (*Id.*). He also indicated that he had depression and anxiety. (Tr. 600). Upon examination, Sherwood appeared alert, oriented, and in no apparent distress; had pleasant mood; displayed normal cervical, thoracic, and lumber movement; displayed normal muscle bulk, tone, muscle strength, and sensation; had a negative straight leg test, except for minimum lower back pain; and had normal gait except he had difficulty with heel and toe. (Tr. 600-01). Dr. Moore's consult did not include an assessment or plan of action. *See* (*Id.*).

On March 14, 2018, Sherwood visited Nurse Practitioner Graziani, stating that his lumbar pain had lessened but persisted. (Tr. 602). He rated his pain as 2/10 when sitting and 8/10 when standing. (*Id.*). He took Zanaflex, which relieved the pain. (*Id.*). He had not experienced paresthesia recently and had not experienced numbness or tingling for about three weeks. (*Id.*). He denied anxiety, depression, or delusions. (Tr. 603-04). Upon examination, Sherwood was alert, oriented, cooperative, and in no acute distress. (Tr. 604). His sensation, attention, concentration, fund of knowledge, strength, and gait were normal. (*Id.*). Graziani order epidural injections, which lessened pain more than 50%. (Tr. 605). The injection was administered that same day. (Tr. 612).

On April 17, 2018, Sherwood returned for a follow up on his injections and was seen by Lizzi. (Tr. 615). Sherwood reported that the epidural injection worked, his back pain came and went, and he was able to sit longer. (*Id.*). His examination results were the same as his March 14, 2018 visit. (Tr. 617). Lizzi ordered additional trigger point injections for back pain and epidural injections for lumbar spine. (Tr. 618).

On April 24, 2018, Sherwood was admitted to the Windsor-Laurelwood Center for Behavioral Medicine. (Tr. 395). He had called the suicide hotline with suicidal ideation and had

poor activities of daily living, psychomotor retardation, anhedonia, poor grooming, poor hygiene, and impaired judgment and insight. (*Id.*). He had been taking Zoloft and Abilify. (*Id.*). After admission, Sherwood's mood improved, he tolerated medication without apparent side effects, he attended therapy, and was discharged on April 26, 2018. (Tr. 397). The discharge summary referred him to case management and psychiatric follow up. (*Id.*). He was diagnosed with major depressive disorder, recurrent, severe, without psychotic features. (*Id.*).

On May 4, 2018, Sherwood visited Adam Link, DO, for a follow up on his depression. (Tr. 383). Sherwood reported that his depression was stable, but he still suffered pain which made him consider suicide from time to time. (*Id.*). His pain limited his ability to function, causing him to drop out of school and go on disability. (*Id.*). He weighed 318.6 lbs. (Tr. 384). Upon examination, he appeared alert and oriented, in no acute distress, pleasant, well appearing, and with flat affect. (*Id.*). Dr. Link diagnosed Sherwood with depression, unspecified type, and low back pain. (*Id.*). Dr. Link increased Sherwood's Abilify and discussed osteopathic manipulative treatment. (*Id.*). Sherwood returned on May 14, 2018, reporting no new changes in his physical condition. (Tr. 380). He did, however, report depression. (*Id.*). Dr. Link administered osteopathic manipulative treatment. (Tr. 382).

On May 17, 2018, Sherwood visited Alexandr Dron, MD, for counseling. (Tr. 414). He reported depressed mood, lack of motivation, decreased energy, poor sleep, racing thoughts, and fleeting suicidal thoughts without intent or plan. (*Id.*). Because of his chronic pain, he felt hopeless, was unable to socialize, and had no friends. (*Id.*). Despite no active symptoms, he felt that his medication did not work as well as it used to. (*Id.*). On examination, Sherwood had no apparent psychomotor agitation or retardation, depressed mood, constricted affect, grossly intact attention, concentration, and memory, chronic suicidal ideations, linear and logical thought process, fair judgment and insight, and no side effects. (*Id.*). Sherwood reported 5/10 chronic

15

back pain. (*Id.*). Dr. Dron diagnosed Sherwood with major depressive disorder, recurrent moderate/severe. (*Id.*). He continued Sherwood's medication and added Lithium. (*Id.*).

On May 29, 2018, Sherwood visited Dr. Link for osteopathic manipulation treatment. (Tr. 376). The previous treatment resulted in two to three days with no persistent back pain at rest but continued pain with ambulation. (*Id.*).

On June 6, 2018, Sherwood visited Dr. Benedict and received an epidural injection. (Tr. 622). On June 12, 2018, he visited Zachary Townsend, DO, for a follow up on his back pain and osteopathic manipulation treatment. (Tr. 373). He indicated that his back pain was worse after sitting or standing for prolonged periods of time, had tingling in his right toes, and took meloxicam with relief. (*Id.*). A neurosurgeon had determined that Sherwood was not a candidate for surgery and recommended weight loss. (*Id.*). Sherwood reported his back pain as "alright" and had some improvement after the previous session. (*Id.*). Upon examination, Dr. Townsend noted lumbar paraspinal hypertrophy and decreased range of motion of the lumbar spine with extension. (Tr. 374). Dr. Townsend stated that Sherwood's obesity (315 lbs.) was likely complicating his back pathology and discussed weight loss strategies. (*Id.*). He also employed soft tissue and muscle energy techniques to Sherwood's lumbar spine, with mild improvement in hypertrophy. (*Id.*).

On June 26, 2018, Sherwood returned to Townsend for a follow up. (Tr. 370). Sherwood denied any change in his back pain and denied numbness, tingling, paresthesia, or weakness. (*Id.*). Townsend reiterated his observations from the previous appointment. (Tr. 371-72).

On July 31, 2018, Sherwood presented to Nurse Graziani, indicating that he no longer felt benefits with epidural injections. (Tr. 626). He rated his low back pain as 6/10. (*Id.*). Graziani

ordered a functional capacity evaluation and another epidural injection.  (Tr. 629).  The injection was administered on September 19, 2018.  (Tr. 631).

On August 8, 2018, Sherwood visited Dr. Link after "some time."  (Tr. 366).  Sherwood reported slow improvement and that osteopathic manipulation was beneficial to his functioning and depression.  (*Id.*).  He noted his depression was "not significantly lower than it has been even six months ago."  (*Id.*).  Sherwood also stated that his "back pain is largely stable."  (Tr. 367).  Dr. Link administered osteopathic manipulation treatment.  (Tr. 368).

On August 30, 2018, Sherwood visited Dr. Dron for a follow up.  (Tr. 416).  Since beginning Lithium, Sherwood stated that he noticed a "significant decrease in suicidal ideations," only experiencing them once every couple of weeks with decreased intensity and duration.  (*Id.*).  He reported improved mood, with depression oscillating between 1/10 intensity and 8/10 intensity.  (*Id.*).  He had increased energy, better sleep, and decreased racing thoughts but continued to lack motivation.  (*Id.*).  Upon examination, Sherwood was alert, cooperative, casually dressed, and in no acute distress.  (*Id.*).  He had "fair" activities of daily living, better mood, mildly constricted affect, linear and goal-directed thought processes, grossly intact attention, memory, and concentration, and fair insight and judgment.  (*Id.*).  Dr. Dron began reducing Cymbalta, but continued Zoloft, Abilify, and lithium.  (Tr. 416-17).  He also added Wellbutrin.  (Tr. 417).  No side effects were reported.  (*Id.*).

On August 31, 2018, Sherwood returned to Dr. Link, stating that the relief he got from the previous session lasted four to five days and then his back got worse.  (Tr. 362).  However, Sherwood reiterated that his back pain was stable.  (Tr. 363).  At his request, Dr. Link ordered X-rays of the lumbar spine and performed another manipulation.  (Tr. 363-64).

On September 26, 2018, Sherwood visited Dr. Link and received another osteopathic manipulation.  (Tr. 359-61).

On October 10, 2018, Sherwood returned to Dr. Link, stating that he likely reached a plateau with what osteopathic manipulation treatment could offer him.  (Tr. 356).  He forgot to get the X-rays done.  (*Id.*).  Dr. Link administered another session of manipulation.  (Tr. 357-58).

C.     **Relevant Opinion Evidence**

1.     **Non-Treating Consultant Examination – Wayne Morse, PhD**

On February 8, 2017, Wayne Morse, PhD, prepared a psychological evaluation in connection with Sherwood's application for disability benefits.  (Tr. 277).  Sherwood's self-reported symptoms were consistent with his presentation and suggested depression and anxiety.  (Tr. 278).  He stated that he had a lot more control over his depression since onset. (Tr. 280).  He did not have a lot to be anxious about, could get up and eat a meal, and did not lie around all day.  (*Id.*).  He stated, "I'm feeling quite well now."  (*Id.*).  Sherwood reported that he was able to do most household chores if no lifting was involved and could take frequent breaks. (Tr. 279).  His hobbies consisted of computer games and board games and he got together with friends once a week.  (*Id.*).  Dr. Morse noted that Sherwood had a difficult time sitting due to his back problems.  (*Id.*).  He was casually dressed and was noted as alert and oriented, cooperative, and in a relaxed mood with constricted affect.  (*Id.*).  Sherwood's insight and judgment appeared to be good and he did not report any difficulty managing his finances.  (Tr. 279-80).

Dr. Morse diagnosed Sherwood with major depressive disorder, single episode, in full remission; adjustment disorder with anxiety; and borderline intellectual functioning.  (Tr. 280). He assessed a global assessment functioning score of 68.  (*Id.*).  Dr. Morse opined that Sherwood was likely able to carry out one step and complex work instructions; to concentrate and persist in work-related activity; respond appropriately to coworkers, supervisors, and the general public in a work setting; and deal with normal work pressures in a competitive work setting.  (Tr. 280-81).

### 2.    State Agency Consultants

#### a.    Physical Impairments

On February 28, 2017, Diane Manos, MD, evaluated Sherwood's physical capacity based on a review of the medical record and determined that Sherwood had the physical residual functional capacity ("RFC") to perform medium work.  (Tr. 73-76).  Specifically, Dr. Manos found that Sherwood could occasionally lift 50 lbs.; frequently lift 25 lbs.; stand/walk for 6 hours in an 8-hour workday; push/pull without limitation other than those for lifting and carrying; frequently climb ramps/stairs, kneel, stoop, crawl, and crouch; and occasionally climb ladders/ropes/scaffolds.  (Tr. 73-74).

On June 13, 2017, Maureen Gallagher, DO, concurred with Dr. Manos's determination that Sherwood could perform medium work.  (Tr. 89).  However, Dr. Gallagher additionally found that Sherwood could lift 20 lbs. occasionally and 10 lbs. frequently.  (Tr. 87).

Karen Durecki, the disability examiner on reconsideration, stated that Sherwood's assertion that he could only walk for ten minutes, sit for two hours, and carry no more than a gallon of milk was only partially consistent with the evidence.  (Tr. 86, 90).  Durecki explained that medical records showed right leg pain, degenerative disc disease, lower back pain, and bulging discs, but "MER shows that he has nml strength, nml ROM, and nml gait, and a EGM revealing no nerve damage."  (Tr. 86).

#### b.    Mental Impairments

On February 25, 2017, Robert Baker, PhD, evaluated Sherwood's mental capacity based on a review of the medical record.  (Tr. 71-73).  Baker found that Sherwood had only mild limitations in his ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; or adapt or manage himself.  (Tr. 71).  On June 13, 2017, Vicki Warren, PhD, concurred with Dr. Baker's assessment.  (Tr. 85).

19

**D.    Relevant Testimonial Evidence**

**1.    Sherwood**

Sherwood – appearing pro se – testified at the October 16, 2018 ALJ hearing.  (Tr. 40-54).  He lived in his parents' house and had not worked since 2015.  (Tr. 42-43).  Through August 2017, he was able to do household chores for a "brief amount of time."  (Tr. 43).  He could pick up things and "run the sweeper," sweep, and dust for a "short amount of time," but he avoided these activities because they caused lower back pain.  (Tr. 43-44).  He did laundry often but standing caused pain.  (Tr. 44).  Sherwood could prepare food for himself and spent most of the day laying down in his room or in the living room.  (*Id.*).  In his room, he would browse the internet, watch videos, and watch Netflix on his phone.  (*Id.*).  Sherwood played videogames but was limited in how long he could do so because his back would hurt when he sat for too long.  (Tr. 45).  On average, he could sit for a couple of hours before needing to stop.  (*Id.*).  He played with his friends and with strangers online.  (*Id.*).

Sherwood testified that he met with his friends once a week to play Dungeons and Dragons because it was an activity he could do while laying down.  (Tr. 46).  Dungeons and Dragons sometimes required standing, which was a challenge.  (*Id.*).  He could drive but sitting hurt, and he was uncomfortable sitting at the hearing.  (Tr. 47).  He could manage the discomfort of driving.  (*Id.*).  Sherwood drove three to four times per week on five-minute trips.  (*Id.*).  His mother did his grocery shopping for him.  (*Id.*).

Sherwood continued that he did most of his video game shopping online, did not go out to eat, and lived "a pretty boring life."  (Tr. 48).  He was 6 ft. tall and weighed 330 lbs.  (*Id.*).  To manage his weight, he cut back calories.  (Tr. 49).  Exercise was difficult because it required movement of his back.  (*Id.*).  He believed that he could stand/walk for up to 30 minutes and sit for up to 2 hours.  (Tr. 50).  He could lift 10 lbs. so long as he did not use his back.  (*Id.*).  To

manage his pain, Sherwood laid down and did stretches.  (Tr. 50-51).  Medication helped but didn't solve his back pain.  (Tr. 51).  He started counseling for his depression and anxiety in 2016 and saw a counselor every three weeks, though he went a long period without seeing one. (*Id.*).  His medication helped his symptoms, though he was involuntarily hospitalized in 2018. (Tr. 51-52).  Sherwood did not believe that he could work because he could not sit, stand, or lift without pain.  (Tr. 53).  His medications caused drowsiness, though he did not specify which one.  (Tr. 54).

### 2.      Sherwood's Mother

Mary Sherwood ("Mary") – Sherwood's mother – also testified.  (Tr. 54-57).  In January 2016, Sherwood could not stand, sit, or walk.  (Tr. 55).  His doctors did not take him seriously and, because of their persistence, an MRI revealed that he had a rare condition – congenital narrowing of the spine.  (*Id.*).  Sherwood could not sit very long, walk very far, or stand.  (Tr. 56).  He could not launder his own clothes because he could not bend or twist; cook because he could not stand; grocery shop because he could not walk; or drive long distances.  (*Id.*).  Some days were better than others due to his injections.  (*Id.*).

### 3.      Vocational Expert

Mitchell Norman, a vocational expert ("VE"), testified.  (Tr. 57).  He first assumed an individual with Sherwood's age and education, restricted to medium work, and who could occasionally climb ladders/ropes/scaffolds; frequently climb of ramps/stairs; frequently balance, crouch, kneel, stoop, and crawl; understand, remember, and carry out simple, routine tasks; make judgments on simple work; and respond appropriately to usual work situations and changes in a routine work setting with few and occasional changes.  (Tr. 60).  The VE testified that there were jobs in the national economy that such an individual could perform.  (*Id.*).  The same was true if the individual were restricted to light work – such as assembler of plastic hospital products,

garment bagger, and lab sample collector.  (Tr. 60-61).  The VE's answer would not change if the individual could never climb ladders/ropes/scaffolds and only occasionally climb ramps and stairs, balance, crouch, kneel, stoop, and crawl.  (Tr. 61).  The individual would be unemployable, however, if he missed two to three days of work a month on a regular basis due to pain, including leaving early and arriving late.  (*Id.*).

Sherwood stated that he did not think he "fit in like, an eight-hour shift of standing and sitting."  (Tr. 62).

**III.    The ALJ's Decision**

On March 14, 2019, the ALJ issued a written decision denying Sherwood's claim.  (Tr. 11-25).  The ALJ made the following paraphrased findings relevant to Sherwood's arguments in this case:

1.  The date last insured was June 30, 2017.  (Tr. 13).

3.  Sherwood had the severe impairments of: obesity; lumbar degenerative disc disease with L4-L5 disc bulge with congenital narrowing; and psychological conditions variously described as an adjustment disorder with anxiety and major depressive disorder.  (Tr. 14).

4.  Sherwood had no impairment or combination of impairments that met or medically equaled the severity of the listed impairments.  (*Id.*).

Though no longer a listed impairment, Sherwood's obesity was considered in relation to the musculoskeletal, respiratory, and cardiovascular body systems listings.  (Tr. 15).

5.  Sherwood had the RFC to perform light work except: no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; occasional balancing, crouching, kneeling, stooping, and crawling; can understand, remember, and carry out simple, routine tasks; can make judgments on simple work; and can respond appropriately to usual work situations and changes in a routine work setting with few and occasional changes.  (Tr. 16).

Although the record contained significant evidence dated after the date last insured, because the Sherwood was not found to have been disabled prior to his date last insured, this evidence was found to be of limited probative value. "Regardless, I have reviewed and considered the entire record, taking particular

22

note of information that is in any way indicative of [Sherwood's RFC] prior to June 30, 2017." (Tr. 20-21).

10. Considering Sherwood's age, education, work experience, RFC, and the VE testimony, there were jobs that existed in significant numbers in the national economy that he could perform, such as assembler, garment bagger, and lab sample collector. (Tr. 24.).

Based on all of her findings, the ALJ determined that Sherwood was not disabled. (Tr. 24-25).

## IV. Law & Analysis

### A. Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Substantial evidence" is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones*, 336 F.3d at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support. *Rogers*, 486 F.3d at 241; *see also Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("It is not our role to try the case de novo." (quotation omitted)). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the

national economy.  20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits.  20 C.F.R. § 404.1512(a).

**B.      Step Three: Listing 1.04**

Sherwood argues that the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence in evaluating whether his musculoskeletal impairments met or medically equaled Listing 1.04.  ECF Doc. 15 at 10-13.  Liberally construing his brief, Sherwood argues that in evaluating whether or not Listing 1.04 was met or medically equaled, the ALJ failed to consider the medical evidence after the date last insured, contrary to Listing 1.00H1. ECF Doc. 15 at 10-11.  He argues that the ALJ relied on the general definition of ineffective ambulation – Listing 1.00J – and ignored 1.00B2a, 1.00B2b(2), 1.00K3, and 1.04C.  ECF Doc. 15 at 12-13.  He asserts that he satisfied the severity requirements for Listing 1.04 because his testimony that he could not stand or walk without pain, his pain increased the longer he stood/walked, and his recovery period lengthened the longer he stood/walked, established that the severity criteria for Listing 1.04.  ECF Doc. 15 at 13.  He further asserts that his medical records established that he could not ambulate effectively on a sustained basis due to pain, such as his MRI and X-ray results.  *Id.*

The Commissioner responds that that the regulations foreclose consideration of evidence post-dating the last-insured date.  ECF Doc. 16 at 8.  The Commissioner argues that Sherwood pointed to no evidence demonstrating that he met Listing 1.04, asserting that there was no evidence of nerve root compromise or that he otherwise met the severity requirements.  ECF Doc. 16 at 8-9.  Sherwood's untimely-filed reply brief reiterated his arguments.  ECF Doc. 18.

1.    **Listings Standard**

At Step Three, a claimant has the burden to show that he has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. pt. 404, Subpt. P, App 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant meets all of the criteria of a listed impairment, he is disabled; otherwise, the evaluation proceeds to Step Four. 20 C.F.R. § 404.1520(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision).

Under the regulatory framework existing at the time of the ALJ's decision, Listing 1.04 was used to determine whether a claimant's spine disorder "result[s] in compromise of a nerve root . . . or the spinal cord," with:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular

pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.04 (2019).[2]  To be unable to effectively ambulate, a claimant must have "an extreme limitation of the ability to walk."  20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.00B2b(1).  In determining whether a claimant has such an extreme limitation, the ALJ must consider whether the:

> [I]ndividual [ is] capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to and from a place of employment or school.  Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.  The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.00B2b(2).

## 2.    Analysis

The ALJ applied proper legal standards and reached a decision supported by substantial evidence in concluding that Sherwood's musculoskeletal impairments did not meet or medically equal Listing 1.04.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ complied with the regulations by actually evaluating the evidence, comparing the limitations supported by that evidence with the requirements under Listing 1.04, and explaining that the evidence did not show nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis as required under Listing

---

[2] On December 3, 2020, the Social Security Administration revised the medical criteria for evaluating musculoskeletal disorders.  85 FR 78164 (Dec. 3, 2020).  Under the revised Listings, Listing 1.04 has been replaced by Listing 1.15, which has different criteria than Listing 1.04.  *Compare*, 85 FR 78164 *78179-80, *with* 20 C.F.R. pt. 404, Subpt. P., App. 1 § 1.04 (2019).  The revised Listings were effective April 2, 2021 and were only given prospective application.  85 FR 78164 *78164.  Thus, I will apply the regulations in effect at the time of the ALJ's decision in reviewing his Step Three determination.  *Jones v. Comm'r of Soc. Sec.*, No. 1:17 CV 662, 2018 U.S. Dist. LEXIS 143590, at *24 (N.D. Ohio Aug. 23, 2018).

1.04. *Reynolds*, 424 F. App'x at 416; 20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.04; (Tr. 14-15).

And the ALJ's conclusion that Sherwood did not meet the extreme ambulation limitation

requirements in Listing 1.00B2b was supported by substantial evidence, including: (1) treatment

notes through the date last insured indicating that Sherwood could walk without assistance, had

normal ambulation, gait, strength, and sensation; had minor gait disturbance and negative

straight leg raises; and medication helped alleviate his symptoms; (2) MRI results showing no

apparent nerve root or canal protrusion; (3) Dr. Manos's and Dr. Gallagher's opinions that

Sherwood could stand/sit/walk for six hours in an eight-hour workday and perform medium

work; (4) Dr. Morse's statement in his opinion that Sherwood could do most household chores if

not lifting was involved and he was able to take frequent breaks; and (5) Sherwood's testimony

that he could pick things up, run the sweeper, sweep, dust, and do laundry for brief periods of

time. (Tr. 43-44, 239, 243, 246, 249, 252, 255-56, 258-59, 264-65, 269-70, 272, 279, 332-34,

314-15, 328-29, 310-11, 306-07, 322-25).

　　Although Sherwood faults the ALJ for not considering evidence that post-dated the last

insured date, his contention is belied by the record. At Step Four, the ALJ expressly addressed

Sherwood's medical records from after the date last insured, stating that she considered the entire

record and took "particular note of any information that is in any way indicative" or Sherwood's

RFC. (Tr. 20-21). Reading the ALJ's decision as a whole and with common sense, the ALJ

considered evidence post-dating the date last insured in making her determination whether the

Listings were met. *See Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir.

2010) ("[W]e read the ALJ's decision as a whole and with common sense."). The ALJ's

consideration of the evidence was consistent with what the law requires. *Carter v. Comm'r of*

*Soc. Sec. Admin.*, 5:12CV2321, 2013 U.S. Dist. LEXIS 106461, at *15 (N.D. Ohio July 31,

2013) ("[M]edical evidence that postdates the insured status may, and ought to be, considered

insofar as it bears on the claimant's condition prior to the expiration of insured status."
(quotation marks omitted)); *see also Kingery v. Comm'r of Soc. Sec.*, 142 F. Supp. 3d. 598, 602
(S.D. Ohio 2015).  And the post-last-insured-date evidence did not undermine the ALJ's
determination that Sherwood had extreme limitations in his ability to walk, especially given his
continued normal physical examinations and 4-5/10 pain through August 2017.  (Tr. 473-75,
482).  Although his later treatment records showed increasing pain and diminished response to
treatment, those records are evidence of Sherwood's change in condition after the date last
insured, not his condition on or before June 30, 2017.  (Tr. 356-58, 362-64, 366-68, 373-74, 386-
88, 414, 484-87, 586-90, 598-601, 602-05, 615-18, 626); *see Moon v. Sullivan*, 923 F.2d 1175,
1182 (6th Cir. 1991) ("In order to establish entitlement to [DIB], an individual must establish
that he became 'disabled' prior to the expiration of his insured status.").

Because substantial evidence supported the ALJ's finding that Sherwood did not satisfy
the severity criteria for Listing 1.04, that decision fell within the Commissioner's "zone of
choice" and cannot be overturned by this court.  *Biestek*, 139 S. Ct. at 1154; *Rogers*, 486 F.3d at
241; *Mullen*, 800 F.2d at 545; *O'Brien*, 819 F. App'x at 419.  I recommend that the ALJ's
conclusion that Sherwood's physical impairments, singly or in combination, did not meet or
medically equal the severity criteria of Listings 1.04 be affirmed.

### C.    Step Four: Subjective Symptom Complaints and RFC

Sherwood argues that the ALJ failed to apply proper legal standards and reach a decision
supported by substantial evidence in evaluating his subjective symptom complaints.  ECF
Doc. 15 at 8-15.  Referring to the Social Security's denial of benefits at the reconsideration level,
Sherwood argues that the disability examiner's finding that his statements regarding the severity
of his symptoms was "partially consistent" with the evidence based only on an EMG failed to
comply with the regulations.  ECF Doc. 15 at 8.  He contends that the regulations do not permit

discounting subjective symptom complaints solely because they were not substantiated by the medical evidence. ECF Doc. 15 at 8-9.

Sherwood argues that the medical evidence – including the evidence from after the date last insured – supported his allegation that his physical and mental impairments would be disabling, such: as MRI and X-ray imaging tests; treatment notes indicating that it might not be possible to get to a pain-free state and showing gait disturbance, limited straight leg tests, and paresthesia; his diagnosis of radiculopathy; his efforts to manage his pain, depression, and anxiety with injections and medication; medication side effects, which he claimed included drowsiness caused by his anxiety and depression medication; and his and his mother's testimony. ECF Doc. 15 at 9-10.

Sherwood continues that the ALJ failed to consider the medical record through the date of the hearing, and the ALJ could not deny disability on the basis that his treatment seemed conservative. ECF Doc. 15 at 10-12. He also argues that his activities of daily living did not establish that he could work because he testified that he had to lie flat on his back while playing games; he needed assistance with performing household chores; his caregiver did his shopping and meal preparation for him; he had to take frequent breaks to complete tasks; and he could only drive short distances. ECF Doc. 15 at 13-15.

The Commissioner responds that the ALJ applied proper legal standards in evaluating Sherwood's subjective symptoms complaints and reasonably determined that he could perform light work. ECF Doc. 16 at 5-9. The Commissioner argues that the ALJ could properly consider the lack of aggressive treatment for Sherwood's back and none of the opinion evidence assessed greater limitations than those listed in the ALJ's RFC. ECF Doc. 16 at 6. The Commissioner argues that Sherwood the decision at issue is the ALJ's decision, not that of the disability examiner's at reconsideration. ECF Doc. 16 at 7. The Commissioner asserts that Sherwood's

argument that the ALJ could not rely on medical evidence to discount his allegations was contrary to the regulations and circuit precedent. *Id.*

### 1. Step Four Standard

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). The RFC is an assessment of a claimant's ability to do work despite her impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5, at *14. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5, at *13-14.

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). Nevertheless, an ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about his symptoms when it is inconsistent with objective medical and other evidence. *See Jones*, 336 F.3d at 475–76; SSR 16-3p, 2016 SSR LEXIS 4, at *15 (Mar. 16, 2016) ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence."). In evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors, including the claimant's daily activities, the nature of the claimant's symptoms, the claimant's efforts to alleviate his symptoms, the type and efficacy of any treatment, and any other factors concerning the claimant's functional limitations and

restrictions.  SSR 16-3p, 2016 SSR LEXIS 4, at *15; 20 C.F.R. § 404.1529(c)(3); *see also*

*Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ

properly considered a claimant's ability to perform day-to-day activities in determining whether

his testimony regarding his pain was credible).

     If an ALJ discounts or rejects a claimant's subjective complaints, she must clearly state

her reasons for doing so.  *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).  The ALJ

need not explicitly discuss each of the factors.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th

Cir. 2012).  Although the ALJ must discuss significant evidence supporting his decision and

explain his conclusions with sufficient detail to permit meaningful review, there is no

requirement that the ALJ incorporate all the information upon which she relied into a single tidy

paragraph.  *See Buckhannon ex rel. J.H.*, 368 F. App'x at 678-79.

     **2.**    **Analysis**

     As a preliminary matter, Sherwood's challenge to the disability examiner's evaluation on

reconsideration of his subjective symptom complaints is misplaced.  The scope of our review is

limited to the "final decision" of the Commissioner: (1) the decision of the ALJ when the

Appeals Council denies review; *or* (2) the decision of the Appeals Council when it grants review.

42 U.S.C. § 405(g); *Sims v. Apfel*, 530 U.S. 103, 107 (2000).  The Commissioner's denial of

benefits at the reconsideration level is a step on the way to a "final decision," but it is not the step

at which the court conducts its review.  *See Johnson v. Comm'r of Soc. Sec.*, 97 F. App'x 526,

527-28 (6th Cir. 2004) (explaining the process by which the Commissioner's decision becomes

"final"). Thus, I limit my review to the ALJ's evaluation of Sherwood's subjective symptom

complaints.

     The ALJ applied proper legal standards in evaluating Sherwood's subjective symptom

complains and assessing his RFC.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ

complied with the regulations by: (1) assessing Sherwood's RFC in light of the medical evidence, his testimony, and other evidence in the record; and (2) clearly explaining that she rejected Sherwood's subjective symptom complaints because his statements regarding the intensity, persistence, and limiting effects of his physical and mental impairments were not consistent with the objective medical evidence. 20 C.F.R. § 404.1520(e); SSR 16-3p, 2016 SSR LEXIS 4, at *3-4, 11-12, 15; SSR 96-8p, 1996 SSR LEXIS 5, at *13-15 (Tr. 16-20, 22-23). The ALJ provided sufficiently clear reasons for rejecting Sherwood's subjective symptom complaints when she stated that: (1) Sherwood's activities of daily living – completing personal care tasks, interacting with friends, playing video games, household chores, and driving – were inconsistent with an inability to work; (2) his normal physical exams and conservative treatment for his back and leg pain was inconsistent with the alleged severity of his physical symptoms; and (3) his conservative treatment for his mental health impairments were generally not consistent with the claimed severity of his mental health symptoms. *Felisky*, 35 F.3d at 1036; (Tr. 20-23).

The ALJ's reasoning tracked three of the relevant factors, including Sherwood's activities of daily living; the location, duration, frequency, and intensity of his symptoms; and his treatment. 20 C.F.R. § 404.1529(c)(3); *see Temples*, 515 F. App'x at 462. The ALJ could consider the conservative nature of Sherwood's treatment and rely on it as a basis upon which to discount his subjective symptom complaints. *Piercy v. Comm'r of Soc. Sec.*, 5:18 CV 2214, 2019 U.S. Dist. LEXIS 198499, at *37-38 (N.D. Ohio Nov. 15, 2019). And as discussed above, the ALJ considered the longitudinal record, including evidence post-dating the date last insured to the extent it shed light on Sherwood's condition during the period being evaluated. *Carter*, 5:12CV2321, 2013 U.S. Dist. LEXIS 106461, at *15; (Tr. 20-21). Thus, the ALJ applied proper legal standards in evaluating Sherwood's subjective symptom complaints.

Substantial evidence also supports the ALJ's conclusions regarding Sherwood's subjective symptom complaints.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Substantial evidence supports the ALJ's determination that – during the relevant period – Sherwood had normal strength and sensory exams and received conservative treatment for his back pain.  (Tr. 23).  Such evidence includes: (1) physical examination results during the relevant period and through October 2017 showing normal strength in the lower extremities, intact sensation, normal gait, and negative straight leg raise; (2) treatment notes through and immediately after June 30, 2017 showing that Sherwood received conservative treatment for his back pain, including medication, physical therapy, epidural steroid injections, and trigger point injections; (3) Dr. Gallagher's and Dr. Manos's opinions that Sherwood could perform medium work; (4) Sherwood's statement to Dr. Morse and testimony that he could do most household chores, albeit with frequent breaks; and (5) imaging results during the relevant period showing "stable back," normal EMG, and no nerve root or canal protrusion.  (Tr. 43-44, 73-74, 76, 87, 89, 239, 245-46, 249, 252, 255-56, 258-59, 264-66, 268-70, 272, 279, 310-11, 314-15, 322-25, 328-29, 332-34, 387-88, 469-70, 476, 482, 484-87, 586-88).

And substantial evidence supports the ALJ's findings (i) that the record did not corroborate the severity of Sherwood's mental health symptoms and (ii) that his symptoms were managed successfully through conservative treatment through the relevant period.  Specifically: (1) Sherwood's statements to his providers during the relevant period that his depression was improving, his medication was effective, he did not suffer side effects from his medication, and his lack of motivation was not a barrier to progress; (2) Sherwood's statement to Porter that his only barrier to employment was his chronic pain (not mental health); (3) mental health examinations during the relevant period noting that Sherwood was alert, oriented, in no acute distress and had normal fund of knowledge, judgment, and insight; (4) Dr. Baker's and Dr.

34

Warren's opinions that Sherwood's mental health impairments only caused mild impairments; (5) Dr. Morse's opinion that Sherwood likely could carry out instructions, concentrate and persist in work-related activity, respond appropriately to others, and deal with normal work pressures; and (6) Sherwood's testimony that he could handle his personal care, socialize, play video games, and interact with friends – all of which could reasonably be considered as relevant to his ability to adapt or manage himself, concentrate, and interact with others.  (Tr. 238-39, 245-46, 248-49, 252, 255, 258-59, 269, 287-88, 305-06, 307, 309-10, 313-15, 322, 387, 474, 485, 587, 590, 600, 603-04).  Even if other evidence in the record, or even a preponderance of the evidence in the record could have supported a different conclusion, because substantial evidence supported the ALJ's subjective symptom evaluation, this court cannot overturn it.  *O'Brien*, 819 F. App'x at 416; *Jones*, 336 F.3d at 476; *Rogers*, 486 F.3d at 241; *Biestek*, 880 F.3d at 783.

Because the ALJ applied proper legal standards and his conclusions were reasonably drawn from the record, the ALJ's evaluation of Sherwood's subjective symptom complaints and ultimate RFC assessment fell within the Commissioner's "zone of choice" and cannot be disturbed by this court.  *Mullen*, 800 F.2d at 545.

### D.    Step Five: VE Hypothetical

Sherwood last argues that the ALJ's hypotheticals to the VE did not contain all of his limitations.  ECF Doc. 15 at 15.  Specifically, Sherwood contends that the ALJ's hypothetical did not account for his pain and need for recovery after prolonged standing, walking, or sitting. ECF Doc. 15 at 15-16.  The Commissioner responds that, because the ALJ's hypothetical included the limitations the ALJ found credible, the ALJ properly relied on the VE's testimony as substantial evidence to find that there were significant number of jobs in the national economy Sherwood could perform.  ECF Doc. 16 at 9-10.

1.      **Step Five Standard**

At the final step of the sequential analysis, the burden shifts to the Commissioner to produce evidence supporting the contention that the claimant can perform a significant number of jobs in the national economy. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. § 404.1520(a)(4)(v). An ALJ may determine that a claimant has the ability to adjust to other work in the national economy by relying on a VE's testimony that the claimant has the ability to perform specific jobs. *Howard*, 276 F.3d at 238. A VE's testimony in response to a hypothetical question is substantial evidence when the question accurately portrays the claimant's RFC. *See id.* (stating that "substantial evidence may be produced through reliance on the testimony of a [VE] in response to a 'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments" (internal quotation marks omitted)); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (unpublished) (stating that the ALJ's hypothetical question must "accurately portray[] a claimant's vocational abilities and limitations"). "An ALJ is only required to incorporate into a hypothetical question those limitations [she] finds credible." *Lee*, 529 F. App'x at 715.

2.      **Analysis**

The ALJ applied proper legal standards and reached a conclusion supported by substantial evidence in determining that Sherwood was not disabled at Step Five. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. The ALJ was only required to incorporate limitations into the RFC and hypothetical question which she deemed credible. *Lee*, 259 F. App'x at 715. As discussed above, the ALJ properly and reasonably discounted Sherwood's subjective symptom complaints. Thus, the ALJ was not required to incorporate Sherwood's asserted need for recovery periods after prolonged standing, sitting, or walking. *Id.* Because the ALJ's hypothetical to the VE included the limitations the ALJ found credible and excluded those

limitations that were discredited for legally sufficient reasons, the ALJ's determination that Sherwood could perform a significant number of jobs in the national economy is supported by substantial evidence. *Howard*, 276 F.3d at 238.

## V. Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Sherwood's application for DIB be affirmed.

Dated: June 21, 2021

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).